**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **TODD WHITE**, | * | |
| 25212 Chapelweigh Drive, | | |
| Farmington Hills, Michigan 48336 | * | |
| | | |
| Plaintiff, | * | Civil Action No._____ |
| | | |
| v. | * | Honorable _____ |
| | | |
| **ACELL, INC.,** | * | **JURY DEMAND** |
| 6640 Eli Whitney Drive | | |
| Suite 200 | * | |
| Columbia, Maryland 21046 | | |
| | * | |
| **Serve on:** | | |
| The Corporation Trust, Inc. | * | |
| 2405 York Road | | |
| Suite 201 | * | |
| Lutherville, Timonium Maryland | | |
| | * | |
| Defendant. | | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**COMPLAINT AND JURY DEMAND**

Plaintiff, Todd White, by and through his undersigned attorneys, hereby submits his Complaint and Jury Demand against Defendant, ACELL, INC., stating as follows:

**JURISDICTION AND VENUE**

1.     This is an action brought to remedy, *inter alia*, Defendant's unlawful retaliation against Plaintiff pursuant to the False Claims Act, 31 U.S.C. § 3730(h) and the Maryland False Claims Act, MD Code Ann., Gen. Prov. § 8-700; Defendant's unlawful violation of Plaintiff's civil rights and retaliation against Plaintiff pursuant to the Civil Rights Act of 1991, 42 U.S.C. § 1981 (2000); and Defendant's breach of its anti-retaliation agreement.

2.     This Court has original jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(4) (involves a Federal Act protecting civil rights). This court also has supplemental jurisdiction over Plaintiff's state law claims.

3.      This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant has its principal place of business in this District and it regularly and systematically conducts and transacts business in the District of Maryland.

4.     Venue is proper in this District pursuant to 31 U.S.C. §§ 3729, *et seq* and 28 U.S.C. § 1391(b) and (c) because Defendant has its principal place of business in the District of Maryland and it transacts business in the District of Maryland.

5.     The amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney fees.

## THE PARTIES

6.     Plaintiff is a resident of the State of Michigan.

7.     Defendant is a Delaware corporation with its principal place of business in Columbia, Maryland.  Defendant has as its resident agent for service of process to wit: The Corporation Trust, Inc., 2405 York Road, Suite 201, Lutherville Timonium, MD 21093-2264.

8.     Defendant is a biotechnology company, specializing in regenerative medicine, that develops, manufactures and markets extracellular matrix devices for medical applications.

## FACTUAL ALLEGATIONS

9.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 8 as if fully stated herein.

10.    Plaintiff is an African American male.

11.     On or about September 16, 2013, Plaintiff was hired by Defendant as a sales representative for a territory located in Southern Michigan.  From late 2014 through late 2015, Plaintiff's territory also included northern Ohio.

12.     Prior to his employment with Defendant company, Plaintiff had several years of experience in sales and management level positions within the pharmaceutical and medical device field.  Plaintiff also has an MBA.

### *MatriStem*

13.     Plaintiff was responsible for selling Defendant's MatriStem UBM (Urinary Bladder Matrix), a medical device made from porcine bladder, to hospitals and medical care providers within his territory.

14.     MatriStem is derived from the lamina propria and the basement membrane of a porcine urinary bladder.

15.     MatriStem uses the porcine cellular structure as a scaffold for human tissue regeneration used for chronic wounds, burns, esophageal repair, abdominal wall repair, and colorectal repair.

16.     MatriStem is offered in both graft (or sheet) and powder form.

### *Plaintiff's Sales Performance*

17.     While employed with Defendant, Plaintiff compiled an outstanding sales record.

18.     In 2014, Plaintiff was one of six finalists for the Alan Spievack Award, recognizing the best sales representative in the country.

19.     During the course of his employment, Plaintiff grew his territory's sales to record numbers.

20.     Defendant never had any formal performance reviews of Plaintiff during the entirety of his employment with the company.

21.     However, Plaintiff was consistently recognized by his Area Manager, Tony Bonacorso (hereinafter "Bonacorso") for his strong performance in e-mails, text messages, and gift cards.

22.     On June 1, 2016, Bonacorso sent a text to Plaintiff writing: "Love it!!!!!!  That's why you are the rep that you are man.  On another level!!!"

23.     On December 29, 2016, Bonacorso wrote an e-mail recognizing Plaintiff's performance and work ethic, and encouraging other sales representatives to contact Plaintiff for sales advice:

> Always a tough decision- especially with 4 TM's over 100k, but this one has to go to none other than TW!!!!!!!  All time he has put into his territory up there and now that it's finally paying off is so great to see.  Couple things that I want to mention that I believe put TW as the GRINDER.  First is that there is not an hour of the day this guy isn't putting effort towards growing his territory.  After hour OR stops, l ate [sic] night emails, and first to respond to a txt in the morning.  Love it.  Second- TW has a few accounts that start cases <u>at 6:30 a.m.</u> and they are about 40 mins away from his house.  Best part this is that he never once complained- he puts his head down and shows up for the case.  I just recently found out about this…   Last point is about how he completely revamped his territory up there.  As fact paced as this guy is- he was SMART enough to take a step back and realize his plan wasn't working.  He also wasn't arrogant about the fact others on the TEAM were having success.  So he simply refocused his efforts to replicate others…  Couldn't be happier for you TW.  Let's rally behind this and take it to the next level in 2017!!!!!
>
> p.s. TW is leading the TEAM in sales in December as well… Might be worth giving him a call to see how he is making it happen.  I sure would if I was still a TM.

24.     In May, 2017, Plaintiff's region set a record in sales and he was recognized as a "Quota buster" for his success.  Similarly, as of September 25, 2017, Plaintiff was already at 138 percent of his monthly quota.

25.     On or about October 3, 2017, Bonacorso sent Plaintiff a card writing as follows:

> Congrats on a HUGE Month!!!  Great to see your hard work pay off.  Proud of what you are doing up there.  Tag me in if you ever need anything.  Let's close this year STRONG.

26.     Likewise, in December 2017, Bonacorso sent Plaintiff a Christmas card writing:

> Can't tell you how grateful I am to have you a part of this TEAM.  Thank you for sticking it out & continuing to grind the way you do.  Your effort is truly admirable.  I know 2017 has brought US adversity, but I promise WE will get through it.  The future is bright & 2018 is going to be your year.  I can feel it.  Tag me in where you see fit.
>
> Enjoy the holidays with the fam.  You deserve it!

### Mike Snyder's Racial Animus

27.     From the inception of Plaintiff's employment with the Defendant, Plaintiff was subjected to racial harassment and discrimination by Defendant and their agents, including, but not limited to, Region Manager, Mike Snyder ("Snyder").

28.     On or about July 20, 2015, Plaintiff had an initial dinner meeting at J Alexanders in Novi, Michigan with Snyder, who told Plaintiff that he was raised by a "black mammy."  During that dinner, Snyder also referenced the level of crime in Milwaukee and stated that he had something for "them people."   The following day, Snyder texted Plaintiff a threatening photograph of an empty gun holster on his personal car steering wheel demonstrating what he had for them.

29.     On August 26, 2016, during a dinner meeting, Snyder told Plaintiff, "boy, you really look darker than normal.  I don't remember you being this dark."

30.     Plaintiff texted a 'thumbs up' emoji, to which Snyder replied "How did you find the brown one? Mine are only yellow."

31.     On September 22, 2017, Plaintiff's flight was delayed to the ACell Wound Symposium in St. Louis, Missouri.  Upon arriving at the symposium, Plaintiff was publicly berated by Snyder, who demanded that Plaintiff prove the flight was delayed.  Upon verifying that the flight was delayed, Snyder pulled Plaintiff aside and said if you do it again "I'll fire your black ass."

32.     In early November, 2017, with Plaintiff succeeding and assured of meeting his budget for 2017, Snyder unilaterally transferred several of his best hospital accounts to a younger sales representative.  Plaintiff had built the relationships at the accounts and the accounts generated significant revenue for Defendant.

33.     Likewise, in early November, 2017, Snyder placed Plaintiff on a Performance Improvement Plan, despite the fact that a month earlier, Bonacorso congratulated Plaintiff in writing on a "HUGE Month" and indicated how proud he was of Plaintiff.

34.     By virtue of the accounts being taken away, Plaintiff lost wages in the form of promised commissions.  The representative who took over the accounts immediately went from subpar performance to performing well above his quota because he inherited Plaintiff's sales numbers.  In this regard, another sales representative, Christine Tucker, texted Plaintiff in November, 2017 and stated: "I'm so sorry to see what I saw on the numbers today!! I know it's your hard work."

35.     As a result, Plaintiff did not receive his commission and/or bonus on sales over his budget as promised and agreed upon by the parties.

### *Government Regulation and Contracts*

36.     Defendant has approval from the United States Food and Drug Administration (hereinafter "FDA") to market MatriStem for certain indications.

37.     Defendant is a governmental contractor.

### *Off-Label Marketing*

38.     Because Defendant's products and devices are regulated by the Food and Drug Administration, the off-label marketing of certain products and devices is illegal and causes health care providers to engage in Medicare fraud by submitting false claims to the United States Government.

39.     Defendant has never had FDA approval for use of MatriStem on fistulas.

40.     Notwithstanding the lack of FDA approval, Defendant engaged in the training of sales representatives to sell surgeons, hospital staff and health care providers on the use of the MatriStem device for off-label purposes, such as the repair and treatment of fistulas.

41.     Bonacorso conducted in-house training presentations wherein sales representatives were taught to sell surgeons, hospital staff and health care providers on the use of the MatriStem device for the off-label purpose of repairing and treating fistulas.

42.     Bonacorso had a bizarre management style, constantly inundating sales representatives with an endless barrage of unnecessary and unprofessional text messages from the early morning until the middle of the night demanding that they sell by any means necessary; encouraging employees to share photographs on personal cell phones of surgical procedures involving MatriStem; texting a photograph of a shirtless young man; asking Plaintiff for contractual language from his many years of experience in the medical device sales field to

incorporate into Defendant contracts; and referring to Plaintiff as "bro", "my man", "old man" and "old head."

43.     Plaintiff was also provided with sales materials designed to convince surgeons, hospital staff and health care providers to use the MatriStem device for the off-label purpose of repairing and treating fistulas.

### *HIPAA Violations*

44.     Sales representatives were required by Bonacorso to share photographs on personal cell phones, used for conducting day to day sales, with team members of surgical procedures of individual patients upon whom MatriStem had been utilized, without the patient's consent, in an effort to solicit other business from surgeons and hospitals.

### *Compensation Losses*

45.     During his entire tenure with Defendant, Plaintiff never received an increase in salary.

46.     In fact, Defendant decreased Plaintiff's compensation in 2015.

47.     Plaintiff's annual sales budgets were manipulated and changed by Defendant without notice and without any basis for the change.

48.     In September 2017, Bonacorso increased Plaintiff's sales budget because of the recent departure of another sales representative.

49.     In November 2017, Snyder removed several of Plaintiff's hospital accounts.

50.     Because of Defendant and its agents' discriminatory and retaliatory conduct, Plaintiff suffered loss of wages, loss of commissions, loss of bonus compensation, loss of employment, loss of earnings, loss of earning capacity, loss of fringe benefits; and loss of career opportunities.

8

*Failure to Promote*

51.     During his employment with Defendant, Plaintiff was denied any opportunity for promotion.

52.     On several occasions, Plaintiff contacted Human Resources Manager, Eileen Smith, and advised that he wanted to be considered for management level positions.   His requests were ignored.

53.     In September, 2014, Plaintiff contacted then assistant general counsel, Salman Elmi, and advised that he wanted to be considered for management level positions.  His request was ignored.

54.     On March 4, 2016, Plaintiff contacted then general counsel, Miles Grody, and advised that he wanted to be considered for management level positions.   His request was ignored.

55.     Likewise, on several occasions, Plaintiff advised Tony Bonacorso and Mike Snyder that he wanted to be considered for management level positions.   His requests were ignored.

*Plaintiff's Protected Activity*

56.     During the course of his employment, Plaintiff reported to Bonacorso that Snyder was consistently and improperly harassing him.  On January 5, 2017, Bonacorso sent Plaintiff a text message stating "…I'll keep trying to stiff arm Snyder so he doesn't bother u."

57.     Bonacorso consistently recognized the issues with Mike Snyder texting: "It's all good bud.  The guy has mental issues.  Truly does" and texting on December 19, 2017: "Hang in there.  I'll hold off u knw who.  Do what u got to do up there.  I'm rootin for ya."

58.     Moreover, in October 2017, while traveling from a company conference in St. Louis, Missouri, Plaintiff informed Bonacorso of Snyder's racial animus and harassment of Plaintiff.   Bonacorso replied that he was aware that Synder was "bothering" Plaintiff and Bonacorso stated "I'll keep him off you."

59.     On or about January 18, 2018, Plaintiff, through his attorney, Ben Gonek, informed Defendant in writing that Plaintiff had information and proof that Defendant was engaged in off label marketing.   The letter further advised that Plaintiff intended to file a complaint with the EEOC and the Michigan Department of Civil Rights concerning Defendant victimizing him by racially discriminatory conduct.

60.     Plaintiff intended that Defendant stop its unlawful actions.

61.     Within two (2) weeks of reporting Defendant's off-label marketing, Defendant made Plaintiff return his laptop to the company which rendered Plaintiff unable to log in and complete his weekly reports.   Plaintiff notified Snyder of this issue via text message on February 5, 2018.

62.     On or about January 30, 2018, less than two (2) weeks after Plaintiff reported Snyder's discriminatory practices, Defendant implemented a "Cultural Initiative."

63.     On or about January 30, 2018, Plaintiff had a telephone conferences with Chief Compliance Officer Bill Hrubes (hereinafter "Hrubes") and reported the off-label marketing of MatriStem for fistulas.   Plaintiff also reported to Hrubes that Bonacorso was requiring sales representatives to share photographs of surgical procedures of individuals upon whom MatriStem had been utilized.   Plaintiff was concerned that this practice of sharing photographs via text messages on private telephones violated HIPAA.

64.     On or about February 1, 2018 and February 2, 2018, Plaintiff had additional telephone conferences with Hrubes.

65.     After reporting the foregoing unlawful actions, Snyder and National Sales Manager Brad Adams precluded Plaintiff from attending the company's National Sales Meeting in Nashville, Tennessee on February 11, 2018.

66.     On February 20, 2018, counsel for Defendant left a voice message for an attorney for Plaintiff, Ben Gonek, requesting a date and time to meet and discuss in detail the off-label marketing and discriminatory employment practices reported by Plaintiff.

### *Termination of Employment*

67.     On February 22, 2018, just over a month after Defendant reported off label marketing, discriminatory actions and HIPAA violations, Plaintiff was notified by a telephone call from Snyder and Eileen Smith that his employment was being terminated.  During the telephone call, Plaintiff was not provided with a reason for the termination of his employment.

68.     To date, Defendant has never provided Plaintiff with a reason for terminating his employment.

### COUNT I - RETALIATION IN VIOLATION OF THE
### FALSE CLAIMS ACT, 31 U.S.C. SECTION 3730(h)

69.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 68 as if fully stated herein.

70.     Plaintiff engaged in a protected activity under the False Claims Act (hereinafter "FCA") by: (i) reporting to Defendant that it was engaging in the practice of off-label marketing and training sales representatives to advise surgeons, hospital staff and health care providers to use the MatriStem device off-label; and (ii) reporting to Defendant that his manager was requiring sales representatives to share paragraphs of surgical procedures of individuals upon

whom MatriStem had been utilized, via text messages on private telephones in violation of the Health Insurance Portability and Accountability Act (hereinafter "HIPAA"), to solicit other business.

71.     Plaintiff's reporting of the off-label marketing and training sales representatives to advise surgeons, hospital staff and health care providers to use the MatriStem device off-label was aimed at matters that reasonably could lead to a viable claim under the FCA, and/or aimed at matters demonstrating a distinct possibility of FCA litigation.  In this regard, Defendant was knowingly causing the submission of false and/or fraudulent claims for the use of MatriStem products to government health care programs, including Medicare, Medicaid, Tricare and the Federal Employees Health Benefit Program.

72.     Plaintiff's reporting of a HIPAA violation was aimed at matters that reasonably could lead to a viable claim under the FCA, and/or aimed at matters demonstrating a distinct possibility of FCA litigation.  In this regard, Defendant was committing fraud against the government by violating HIPAA because: (i) the federal government does not knowingly pay claims to contractors who violate Section 1320d-6(a); and (ii) Defendant submitted claims and reports certifying compliance with Medicare laws and regulations without disclosing its HIPAA violation.

73.     Plaintiff objectively believed, and a reasonable employee in the same or similar circumstances would also believe, that Defendant was committing fraud against the government by engaging in the practice of off-label marketing and training sales representatives to advise surgeons, hospital staff and health care providers to use the MatriStem device off-label for repairing and treating fistulas.

74.     Plaintiff objectively believed, and a reasonable employee in the same or similar circumstances would also believe, that Defendant was committing fraud against the government by violating HIPAA.

75.     Plaintiff's actions of reporting the off-label marketing and HIPAA violations were made in an effort to stop Defendant's violations of FCA.

76.     Defendant knew about Plaintiff's protected activity and sought a meeting with Plaintiff two (2) days before firing him.

77.     Plaintiff's actions in reporting these violations are sufficient to support a reasonable conclusion that Defendant feared being reported to the government or sued in a *qui tam* action by Plaintiff.

78.     Plaintiff's employment was terminated by Defendant for engaging in the protected activity under the FCA.

79.     There is a causal connection between the termination of Plaintiff's employment and Plaintiff having informed Defendant in writing that he had information and physical proof that Defendant was engaged in off label marketing.

80.     Defendant did not proffer a reason for terminating Plaintiff's employment.

81.     The timing of Plaintiff's termination further supports a finding of retaliation.

82.     The FCA protects an employee from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

13

83.     As a direct and proximate cause of this violation, Plaintiff has sustained injuries and damages including, but not limited to, the following: loss of employment; loss of earnings, earning capacity and fringe benefits; loss of career opportunities; mental anguish; physical and emotional distress; humiliation; embarrassment; loss of reputation and esteem in the community; and loss of the ordinary pleasures of everyday life, including the opportunity to pursue gainful occupation of choice.

84.     The statute of limitations for filing a claim for retaliation in violation of the FCA is any time within three (3) years of the date when the retaliation occurred.

85.     Plaintiff has commenced this action within three (3) years of the date when the retaliation occurred.

WHEREFORE, Plaintiff requests that judgment be entered against Defendant and Plaintiff be granted the following relief: reinstatement of employment; double damages for back pay; interest on back pay; special damages; lost wages and benefits, past, present and future; compensatory damages; punitive and exemplary damages; interest, costs, and reasonable attorney fees and expert witness fees; any other relief afforded Plaintiff under the FCA; and other legal and equitable relief deemed appropriate by the Court at the time of final judgment.

### COUNT II - RETALIATION IN VIOLATION OF THE MARYLAND FALSE CLAIMS ACT, MARYLAND CODE ANN., GEN. PROV. § 8-107

86.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 85 as if fully stated herein.

87.     As detailed above, Plaintiff engaged in a protected activity under the Maryland False Claims Act by disclosing to Defendant, and/or threatening to disclose to a public body, an activity, policy and practice of Defendant that Plaintiff reasonably believed violated state and federal law.

88.     Plaintiff engaged in a protected activity under the Maryland False Claims Act by (i) disclosing to Defendant that it was engaging in the practice of off-label marketing and training sales representatives to advise surgeons, hospital staff and health care providers to use the MatriStem device off-label; and (ii) disclosing to Defendant that his manager was requiring sales representatives to share paragraphs of surgical procedures of individuals upon whom MatriStem had been utilized, via text messages on private telephones in violation of the Maryland Confidentiality of Records Act, to solicit other business.

89.     By disclosing and/or threatening to disclose the off-label marketing and training sales representatives to advise surgeons, hospital staff and health care providers to use the MatriStem device off-label, Plaintiff's actions were aimed at matters that reasonably could lead to a viable claim under the Maryland False Claims Act, and/or aimed at matters demonstrating a distinct possibility of Maryland False Claims Act litigation.  In this regard, Defendant was knowingly causing the submission of false and/or fraudulent claims for the use of MatriStem products to government health care programs.

90.     By disclosing and/or threatening to disclose Defendant's violations of the Maryland Confidentiality of Records Act, Plaintiff's actions were aimed at matters that reasonably could lead to a viable claim under the Maryland False Claims Act, and/or aimed at matters demonstrating a distinct possibility of Maryland False Claims Act litigation.  In this regard, Defendant was committing fraud against the government by violating the Maryland Confidentiality of Records Act because: (i) the government does not knowingly pay claims to contractors who violate the Maryland Confidentiality of Records Act; and (ii) Defendant submitted claims and reports certifying compliance with state laws and regulations without disclosing its violations of the Maryland Confidentiality of Records Act.

91.     Plaintiff objectively believed, and a reasonable employee in the same or similar circumstances would also believe, that Defendant was committing fraud against the government by engaging in the practice of off-label marketing and training sales representatives to advise surgeons, hospital staff and health care providers to use the MatriStem device off-label for repairing and treating fistulas.

92.     Plaintiff objectively believed, and a reasonable employee in the same or similar circumstances would also believe, that Defendant was committing fraud against the government by violating the Maryland Confidentiality of Records Act.

93.     Plaintiff's actions of reporting the off-label marketing and violations of the Maryland Confidentiality of Records Act were made in an effort to stop Defendant's violations of the Maryland False Claims Act.

94.     Plaintiff's employment was terminated by Defendant for engaging in the protected activity under the Maryland's False Claims Act.

95.     There is a causal connection between the termination of Plaintiff's employment and Plaintiff having informed Defendant in writing that he had information and physical proof that Defendant was engaged in off label marketing.

96.     Defendant did not proffer a reason for terminating Plaintiff's employment.

97.     The timing of Plaintiff's termination supports a finding of retaliation.

98.     As a direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained injuries and damages including, but not limited to, the following: loss of employment; loss of earnings, earning capacity and fringe benefits; loss of career opportunities; mental anguish; physical and emotional distress; humiliation; embarrassment; loss of reputation and

esteem in the community; and loss of the ordinary pleasures of everyday life, including the opportunity to pursue gainful occupation of choice.

WHEREFORE, Plaintiff requests that judgment be entered against Defendant and Plaintiff be granted the following relief: reinstatement of employment; double damages for back pay; interest on back pay; special damages; lost wages and benefits, past, present and future; compensatory damages; punitive and exemplary damages; interest, costs, and reasonable attorney fees and expert witness fees; any other relief afforded Plaintiff under the FCA; and other legal and equitable relief deemed appropriate by the Court at the time of final judgment.

## COUNT III - RACE DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1991, 42 U.S.C. § 1981

99.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 98 as if fully stated herein.

100.    At all relevant and material times, Defendant was an employer, covered by and within the meaning of 42 U.S.C. § 1981.

101.    Plaintiff's race was a motivating factor in Defendant's termination of Plaintiff's employment on or about February 22, 2018.

102.    Defendant, by its agents, representatives and employees, was predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

103.    Defendant's actions were intentional with reckless indifference to Plaintiff's rights and sensibilities.

104.    If Plaintiff were white, he would not have been treated in the manner and subject to the wrongful and discriminatory actions described above.

105.    Defendant, by its agents, representatives and employees, treated Plaintiff differently than similarly situated white employees in the benefits, privileges, terms and conditions of employment, based on unlawful consideration of race.

106.    Defendant has no legitimate, nondiscriminatory reason for its discriminatory acts.

107.    Defendant did not proffer a reason for terminating Plaintiff's employment.

108.    Any alleged legitimate, nondiscriminatory reason to be subsequently proffered by Defendant is pretextual.

109.    As a direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained injuries and damages including, but not limited to, the following: loss of employment; loss of earnings, earning capacity and fringe benefits; loss of career opportunities; mental anguish; physical and emotional distress; humiliation and embarrassment.

110.    Defendant is also in violation of United States Executive Order 11246 which requires government contractors not to discriminate on the basis of race and to take affirmative actions to ensure equal employment opportunity.

WHEREFORE, Plaintiff requests that judgment be entered against Defendant and Plaintiff be awarded lost wages and benefits, past, present and future; compensatory damages; punitive and exemplary damages; interest, costs, and reasonable attorney fees and expert witness fees; any other relief afforded Plaintiff under 42 U.S.C. 1981; and other legal and equitable relief deemed appropriate by the Court at the time of final judgment.

## COUNT IV – RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1991, 42 U.S.C. § 1981

111.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 110 as if fully stated herein.

112.    At all relevant and material times, Defendant was an employer, covered by and within the meaning of 42 U.S.C. § 1981.

113.    Defendant, by its agents, representatives and employees, retaliated against Plaintiff for having informed his employer in writing on January 18, 2018, of his intention to file a complaint with the EEOC and the Michigan Department of Civil Rights concerning Defendant victimizing him by discriminatory conduct, which are actions protected by law.

114.    The retaliation involved treating Plaintiff differently than similarly situated employees with regard to the terms, conditions and benefits of employment, including but not limited to, subjecting Plaintiff to the materially adverse employment action of terminating Plaintiff's employment on or about February 22, 2018, after reporting the discriminatory conduct.

115.    Defendant's actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

116.    There was a causal connection between the termination of Plaintiff's employment and Plaintiff having informed his employer in writing of his intention to file a complaint with the EEOC and the Michigan Department of Civil Rights concerning Defendant victimizing him by discriminatory conduct.

117.    Defendant has no legitimate, nondiscriminatory reason for its discriminatory acts.

118.    Defendant did not proffer a reason for terminating Plaintiff's employment.

119.    Any alleged legitimate, nondiscriminatory reason to be subsequently proffered by Defendant is pretextual.

120.    As a direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained injuries and damages including, but not limited to, the following: loss of employment;

loss of earnings, earning capacity and fringe benefits; loss of career opportunities; mental anguish; physical and emotional distress; humiliation and embarrassment.

WHEREFORE, Plaintiff requests that judgment be entered against Defendant and Plaintiff be awarded lost wages and benefits, past, present and future; compensatory damages; punitive and exemplary damages; interest, costs, and reasonable attorney fees and expert witness fees; any other relief afforded Plaintiff under 42 U.S.C. 1981; and other legal and equitable relief deemed appropriate by the Court at the time of final judgment.

### COUNT V – BREACH OF IMPLIED CONTRACT

121.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 120 as if fully stated herein.

122.    At all times relevant during Plaintiff's employment, Defendant had a Code of Business Conduct and Ethics which set forth an anti-retaliation agreement stating as follows:

**No Retaliation**

The Company expressly forbids any retaliation against any officer or employee who, acting in good faith on the basis of a reasonable belief, reports suspected misconduct.  Specifically, The Company will not discharge, demote, suspend, threaten, harass or in any other manner discriminate against, such an officer or employee in the terms and conditions of his or her employment.  Any person who participates in any such retaliation is subject to disciplinary action, including termination.

(**Exhibit 1:** Code of Business Conduct and Ethics).

123.    Defendant's Code of Business Conduct and Ethics was communicated to and signed by Plaintiff, and the anti-retaliation agreement was part of the terms of Plaintiff's employment with Defendant.

124.    Plaintiff had knowledge of the anti-retaliation agreement during his employment with Defendant.

20

125.    Plaintiff relied on the anti-retaliation agreement in notifying Defendant of his concerns with regard to the company's off-label marketing and violations of HIPAA, as well as Synder's racial discrimination against Plaintiff.

126.    Nevertheless, Defendant did retaliate and discharged Plaintiff for reporting his concerns in direct violation of the anti-retaliation agreement.

127.    Plaintiff has suffered damages as a result of Defendant's breach of its anti-retaliation agreement, including but not limited to, loss of employment, loss of earnings, earning capacity and fringe benefits; loss of career opportunities; mental anguish; physical and emotional distress; humiliation and embarrassment.

## REQUEST FOR DAMAGES

WHEREFORE, Plaintiff requests that judgment be entered against Defendant and Plaintiff be awarded incidental and consequential damages; lost wages and benefits, past, present and future; compensatory damages; punitive and exemplary damages; interest, costs, and reasonable attorney fees and expert witness fees; and other legal and equitable relief deemed appropriate by the Court at the time of final judgment.

## JURY DEMAND

Plaintiff Todd White hereby demands a trial by jury pursuant to Fed. R. Civ. P. 38(b) on all triable issues.

Dated: January 21, 2020                    Respectfully submitted,

                                           _____/s/_____
                                           Chaitra Gowda, Esq. (Bar No. 20891)
                                           cgowda@silvermanthompson.com
                                           SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC
                                           201 North Charles Street
                                           Suite 2600
                                           Baltimore, Maryland 21201
                                           Tel.: (410) 385-2225
                                           Fax: (410) 547-2432


                                           _____/s/_____
                                           Chrisdon F. Rossi, Esq. (*Pending Pro Hac Vice
                                           Admission*)
                                           crossi@rossilawpllc.com
                                           The Rossi Law Firm, PLLC
                                           40950 Woodward
                                           Suite 306
                                           Bloomfield Hills, Michigan 48304
                                           Tel.: (248) 593-9292
                                           Fax: (248) 686-3360


                                           *Attorneys for Plaintiff Todd White*