IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TODD WHITE,                              *

      Plaintiff,                   *

v.                                       *          Civil Action No. GLR-20-173

ACELL, INC.,                             *

      Defendant.                   *
                                ***

**<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on Defendant ACell, Inc.'s ("ACell") Motion for Summary Judgment (ECF No. 51). The Motion is ripe for disposition and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will grant in part and deny in part ACell's Motion.

## I.     BACKGROUND

### A.     <u>Factual Background</u>

On September 16, 2013, ACell hired Plaintiff Todd White, who is African American, as a sales representative. (Offer Letter at 1, ECF No. 51-33). In this role, he was responsible for selling medical devices produced by ACell, focusing his sales on surgical grafts and powders utilized by vascular, colorectal, plastic, and general surgeons. (Decl. Todd White ["White Decl."] ¶ 3, ECF No. 56-17). In 2014, White began reporting to Area Manager Anthony Bonacorso, who in turn reported to Region Manager Mike Snyder.

(Todd White Dep. ["White Dep."] at 44:6–11, ECF Nos. 51-2, 56-13; Anthony Bonacorso

Dep. ["Bonacorso Dep."][1] at 190:19–20, ECF Nos. 51-21, 56-5).

### 1.    Historical Sales Performance

ACell has introduced evidence reflecting that during his time with the company,

White consistently fell short of his sales targets. For example, one exhibit to ACell's

Motion is a spreadsheet containing White's sales figures as compared to his goals for each

period. The spreadsheet indicates that in 2014, White had $344,091 in sales, as compared

to a budget[2] of $696,870; in 2015, White had $620,467 in sales, as compared to a budget

of $681,710; in 2016, White had $673,373 in sales, as compared to a budget of $612,000;

and in 2017, White had $652,906 in sales, as compared to a budget of $728,880. (White

Sales Performance Spreadsheet ["Sales Spreadsheet"] at 3–7, ECF No. 51-11).[3]

White counters that his sales fell below his target goals because he was responsible

for an unusually large sales territory. (White Decl. ¶ 4, ECF No. 56-17). Additionally,

White asserts that Bonacorso conceded that White was growing the business in that

territory at a "decent" rate.[4] White also notes that he was nominated for a prestigious

---

[1] Although Bonacorso's deposition was taken over the course of one day, it was produced in two volumes. ECF No. 51-21 contains excerpts from both volumes of Bonacorso's deposition transcript, while ECF No. 56-5 only contains excerpts from Volume I. The Court will cite to excerpts from Volume I of Bonacorso's deposition as "Bonacorso Dep." and cite to excerpts from Volume II of the deposition as "Bonacorso Dep. Vol. II."

[2] ACell refers to its representatives' sales targets as "budgets."

[3] When referencing exhibits without clear pagination, such as this one, citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

[4] In an apparent clerical mistake, White cites Snyder's deposition testimony, not Bonacorso's, in support of this assertion, and the referenced pages of Snyder's testimony

company award in 2014, which belies the argument that his performance was below par that year. (Spievack Award Announcement at 3, ECF No. 56-29). White also points to a series of text messages and other communications from Bonacorso between June 2016 and January 2018 in which Bonacorso repeatedly praises White. (See ECF Nos. 29–34).

### 2.      Removal from Hospitals

In March and November 2017, White was banned from selling ACell products in two health systems due to his alleged misconduct while on location at hospitals in those health systems. The first ban related to a January 2017 incident in which an ACell customer, Henry Ford Health System ("Henry Ford"), accused White of throwing his shoe at a hospital employee at the Henry Ford location in Wyandotte, Michigan. (See Mar. 29, 2017 Henry Ford Letter ["Ford Letter"] at 1, ECF No. 51-5). Sales representatives visiting the location are required to offer personal collateral, generally car keys or a driver's license, in exchange for borrowing hospital scrubs for the duration of their visit. (White Dep. at 200:14–201:6). White states that he was not carrying his license and did not want to provide the keys to his new car, so instead he placed his shoes on the counter and offered them as collateral. (Id. at 201:8–203:11). The hospital representative took exception to this and voiced her displeasure. (Id. at 203:11–204:17).

White asserts that the following day, the hospital's surgical director called White and told him that he would "never work another case in here ever again . . . . You threw a

---

do not relate to White's sales efforts. (See Mem. Opp'n Def.'s Mot. Summ. J. ["Opp'n"] at 13, ECF No. 56-1; Mike Snyder Dep. ["Snyder Dep."] at 114–15, ECF Nos. 51-20, 56-4).

shoe . . . . I want to talk to your manager." (<u>Id.</u> at 204:21–206:18). Following the incident, White was "no longer welcome" in Henry Ford hospitals, (<u>id.</u> at 208:3–6), and Henry Ford formalized the decision with a permanent ban on March 29, 2017, (Ford Letter at 1). Snyder testified that at the time, he credited White's description of the incident, i.e., that the Henry Ford representative had overreacted to White's reasonable behavior. (Snyder Dep. at 169:21–171:19).

The incident preceding the second ban occurred on October 31, 2017. On that day, White was in the operating room at a Beaumont Health System ("Beaumont") hospital in Farmington Hills, Michigan ("Beaumont Farmington"), when a surgeon, Dr. David Fertel, began an argument with the hospital's surgical director, Steven Witkowski, relating to the use of certain ACell products. (White Dep. at 247:1–248:12). During the argument, Fertel called on White to confirm that the ACell products involved in the disagreement were exempt from certain regulations that would have affected Fertel's treatment of the patient. (<u>Id.</u> at 248:19–249:12). White did so, and Fertel proceeded with the course of treatment, but Witkowski directed White to come and speak to him before he left. (<u>Id.</u> at 249:7–20).

White testified that as he left, he called Bonacorso and informed him that they had "a major problem." (<u>Id.</u> at 250:11–13). White then encountered Witkowski, who informed White that he wanted to talk to White's manager. (<u>Id.</u> at 250:16–251:4). White provided Witkowski with Bonacorso's contact information. (<u>Id.</u>). Bonacorso testified that when White called him, he overheard White "screaming" at Witkowski. (Bonacorso Dep. at 139:14–140:7). However, Fertel testified that White was "professional" and "non-confrontational" in his interactions at the hospital that day. (David Fertel Decl. ¶ 5, ECF

No. 56-39). Snyder and Bonacorso agreed that regardless of whether White was technically correct in supporting Fertel, he had handled the incident incorrectly by becoming involved. (Bonacorso Dep. at 139:3–23; Snyder Dep. at 195:8–18, 198:6–13).

Approximately one month later, Witkowski sent ACell a letter banning White from selling products at Beaumont's Farmington location. (Nov. 28, 2017 Beaumont Letter at 1, ECF No. 56-40). Although the letter referred to only the Farmington location, White testified that he believed he had been banned from "the whole Beaumont system, not just Farmington." (White Dep. at 264:7–9, 272:2–11). Snyder and Bonacorso shared this understanding. (Snyder Dep. at 177:14–19; Bonacorso Dep. at 142:17–19). White speculates that Bonacorso persuaded Witkowski to ban White from the Beaumont system. (White Dep. at 262:14–21, 263:21–264:9). As a result of the two bans, ACell transferred White's Henry Ford and Beaumont accounts to another sales representative. (May 15, 2017 Email Exchange at 2–3, ECF No. 51-6; 2017 Sales Totals Spreadsheet at 2, ECF No. 51-34 (reflecting sales representative Brandon Hafeli's Beaumont account sales)).[5]

### 3.    Performance Improvement Plan

Two days after the incident at Beaumont Farmington, on November 2, 2017, ACell placed White on a performance improvement plan ("PIP"). (White Performance Improvement Plan ["White PIP"] at 2, ECF No. 51-7). The PIP cited three "performance issues" that White needed to improve: (1) White's "sales and activities (speaker programs,

---

[5] The evidence enclosed with the parties' briefs does not make clear whether ACell removed the Beaumont accounts immediately following the Beaumont Farmington incident—i.e., at the end of October 2017—or whether it occurred after receiving the November 28, 2017 letter from Witkowski.

lunches, dinners) outside of current business have greatly reduced"; (2) White's removal from the Henry Ford and Beaumont facilities; and (3) insufficient sales volume.[6] (Id.). Under the heading "Suggested Sales generating activities," the PIP directed White to "[m]eet or exceed your annual quota. . . . The goal is to hit your quota monthly." (Id. at 3). The PIP warned that if White's "performance does not improve to the required levels or [he does] not demonstrate efforts to reach these levels, [his] employment may be terminated during or at the end of" the 90-day PIP. (Id.).

White's sales performance deteriorated considerably after ACell placed him on the PIP. In November 2017, White had $29,913 in sales, as compared to a budget of $60,740; in December 2017, facing the same budget, White had just $13,424 in sales; and in January 2018, White had $14,204 in sales, as compared to a budget of $46,500. (Sales Spreadsheet at 6–7). The shortcoming in White's sales following the PIP was consistent with his removal from the Beaumont accounts, as sales to Beaumont comprised approximately two-thirds of White's total sales for the first ten months of 2017. (See White Account Sales at 1, ECF No. 56-46). White ultimately fell short of his 2017 annual budget by more than $75,000. (Sales Spreadsheet at 6–7).

### 4.    Letter from White's Counsel and Investigation

On January 18, 2018, White, through counsel, sent a letter to ACell's in-house counsel stating that he was considering filing "a complaint with the EEOC and the

---

[6] While the PIP criticizes White for meeting his monthly sales quota just four times over the previous ten months, (White PIP at 2–3), the numbers demonstrate that White was on course to exceed his annual budget as of the date of the PIP, (id.).

Michigan Department of Civil Rights" based on alleged race and age discrimination. (Jan. 18, 2018 Letter from Gonek ["Gonek Letter"] at 1, ECF No. 51-13). The letter referenced a racially insensitive remark by Snyder and several instances where White was treated less favorably than white comparators. (Id. at 2). In a footnote to the letter, White's counsel reported that White had "[come] across a photograph taken several years ago showing Mr. Bonacorso conducting a meeting of various employees of ACell where Mr. Bonacorso was encouraging off-brand marketing,[7] which is the subject of a Department of Justice Investigation." (Id. at 1 n.1).[8] The off-label marketing at issue in the photographs involved alleged marketing of ACell's products for fistula repair, a usage for which they are not indicated. (Bonacorso Photographs at 2–4, ECF No. 51-14; William Hrubes Dep. ["Hrubes Dep."] at 55:13–56:7, ECF Nos. 51-23, 56-2). White's counsel noted that "pursuant to ACell's compliance procedures, Mr. White [was] under an obligation to report" the

---

[7] Although the letter refers to "off-brand marketing," all parties appeared to understand that White's counsel was referring to "off-label marketing." For context, the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA"), "regulates the manufacturing, marketing and sale of prescription drugs, and provides that a drug cannot be sold in interstate commerce unless it is approved by the [United States Food and Drug Administration ("FDA")] for the specific medical use, or 'indication,' listed on the drug's labeling." In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 239 (3d Cir. 2012). Drug companies seeking FDA approval "generally must submit evidence from clinical trials and other testing that evaluate the drug's risks and benefits and demonstrate that it is safe and effective for all of the indications 'prescribed, recommended, or suggested' on the drug's label." Id. While it is true that "[p]rescription drugs frequently have therapeutic uses other than their FDA-approved indications," the FDCA "generally prohibits manufacturers from marketing, advertising, or otherwise promoting drugs for such unapproved or 'off-label' uses." Id. at 239–40.

[8] White later testified that he had uncovered the photographs in late November 2017 while reviewing his records in preparation to write a complaint letter to Human Resources Director Eileen Smith. (White Dep. at 371:17–372:8).

misconduct. (Gonek Letter at 1 n.1). White's counsel proposed scheduling a meeting to "present the photographs" and "discuss a possible severance package for Mr. White." (Id. at 2).

ACell initiated an internal investigation into White's allegations. (Hrubes Dep. at 80:8–83:9). On January 30, 2018, as part of the investigation, White spoke to Chief Risk and Compliance Officer William Hrubes about his concerns and the photographs in his possession. (Hrubes-White Emails at 2, ECF No. 56-44). During the conversation, Hrubes and White discussed possible meeting dates but did not settle on a date. (Id. at 3). Hrubes asked that White contact his attorneys "and request copies of the photos you mentioned during the call be sent to [Hrubes'] attention immediately." (Id. at 2). Hrubes also requested that White overnight his iPad, which Hrubes understood may also contain relevant photographs, to ACell so that the company could make a mirror image of its hard drive. (Id.). Hrubes assured White that ACell would return the iPad the day after it received it. (Id.). White sent in his iPad on February 1, 2018. (Hrubes Text Message at 2, ECF No. 56-45). White did not, however, send Hrubes copies of the photographs of Bonacorso.

On or around February 1, 2018, while the investigation was ongoing, Snyder called White and told him that because of his deficient sales numbers, he could not attend the company's upcoming National Sales Meeting ("NSM"), which was scheduled for February 11, 2018. (White Dep. at 388:20–389:10). Charles Diggins, a former ACell sales representative, testified that while at the NSM, Bonacorso told him and two other representatives that "Todd [White] might be coming for him [i.e., Bonacorso], and if compliance calls, don't answer, let us know compliance called and [Bonacorso] would tell

8

us what to say or just don't say anything to compliance." (Charles Diggins Dep. ["Diggins Dep."] at 38:4–19, ECF Nos. 51-24, 56-9). Diggins added that Bonacorso "pulled us aside and said, some stuff is going down with [White]. If compliance calls, I need you guys to have my back." (Id. at 61:10–19).

After receiving White's iPad, ACell determined that it did not contain any relevant photographs. (Hrubes Dep. at 91:8–20). Thus, ACell continued to work with White and his counsel to schedule a meeting wherein White could present the photographs in his possession. On February 2, 2018, Hrubes wrote to White and asked him to provide a list of possible meeting dates by February 5, 2018. (Hrubes-White Emails at 3). On February 8, 2018, having received neither the photographs nor a response from White or his counsel regarding meeting dates, one of ACell's attorneys wrote to White's counsel and reminded him that as an ACell employee, White was obligated to cooperate with the company's internal investigations. (Feb. 8, 2018 Letter at 1, ECF No. 51-18). The letter proposed a meeting date of February 22 or 23, 2018. (Id.). On February 20, 2018, ACell's counsel called White's counsel, again requesting a meeting; White and his counsel once again declined to respond. (Hrubes Dep. at 95:8–96:7). Hrubes testified that he did not speak to White or his counsel again after his February 2, 2018 email. (Id. at 94:13–18).

### 5.    Termination

ACell asserts that Snyder and Bonacorso first decided to terminate White's employment in early January 2018—before White raised concerns through counsel about race discrimination and off-label marketing—because White was failing to meet the goals set forth in his PIP. (Snyder Dep. at 224:15–20, 233:5–13; Bonacorso Dep. Vol. II at

41:22–42:22). However, Snyder and Bonacorso testified that receipt of the letter from White's counsel caused them to delay their planned termination of White. (Snyder Dep. at 233:14–24; Bonacorso Dep. Vol. II at 42:23–43:23). ACell has not provided documentary evidence to substantiate these assertions.

Sales records reflect that White's performance continued to suffer during January and February 2018, with White logging just $15,383 in sales over those two months against a combined budget of $82,360. (Sales Spreadsheet at 7). This did not satisfy the sales goals set forth in his PIP. (White PIP at 2–3). White alleges, however, that on February 1, 2018, at the conclusion of the initial PIP period, Snyder told him that he had met the requirements of his PIP. (White Decl. ¶ 9). In any event, ACell terminated White's employment on February 22, 2018. (COBRA Letter at 2, ECF No. 51-19).

### 6.     Snyder's Workplace Conduct

Documentary evidence and deposition testimony in the record indicate that Snyder had a long history of making offensive and inappropriate remarks at ACell. (See, e.g., Snyder Performance Improvement Plan ["Snyder PIP"] at 1, ECF No. 56-20 (warning Snyder to "[a]void sarcasm, profanity and name calling" and to "not engage in offensive 'jokes'"); Apr. 2017 Bonacorso-White Text Exchange at 1, ECF No. 56-25 (Bonacorso recounting an incident where "[S]nyder called a girl a cunt to her face"); Snyder Dep. at 98:3–5, ECF Nos. 51-20, 56-4 (Snyder describing an incident where he referred to Bonacorso and another area manager as "you two homos"); Rebecca Underwood Dep. ["Underwood Dep."] at 33:2–24, ECF No. 56-26 (testimony from a female sales

representative describing a time Snyder subjected her to inappropriate remarks of a sexual nature)).

White alleges that, in addition to this behavior, Snyder made a number of insensitive remarks relating to White's race that collectively demonstrate racially discriminatory animus. Among other things, White testified that between July 2015 and September 2017, Snyder: (1) referred to carrying a concealed weapon to defend himself "in the urban jungle" and added that he "ha[s] something for those people," which White understood to refer to non-white people in the city, (White Dep. at 305:3–307:4); (2) informed White that Snyder had been raised by a "black mammy," (id. at 303:3–304:7); greeted White at a dinner by telling him, "you're really dark" and adding that White was "darker than normal," (id. at 312:8–313:18); and, after White arrived late to a symposium, told White that "if you do anything like that again, I'll fire your black ass," (id. at 323:6–325:6). Snyder denies making any of these remarks. (Snyder Dep. at 144:1–18, 152:5–24, 176:22–177:12).[9]

### 7.    Bonacorso's Secret Dropbox

White has also presented evidence that Bonacorso maintained a secret Dropbox folder in which Bonacorso stored unapproved and potentially unlawful marketing materials (the "Dropbox"). One former ACell sales representative with access to the Dropbox testified that it contained "[o]ff-label presentations about burns, about fistulas, closing skin over powder, all kinds of stuff that was considered off-label," (Diggins Dep. at 50:1–5),

---

[9] The Court notes that while counsel for ACell asserts that Snyder denied making any of these remarks, (see Mem. Law Supp. Mot. Summ. J. ["Mot."] at 23–24, ECF No. 51-1), the deposition testimony enclosed with ACell's Motion does not include a denial regarding the comments that White was "really dark" and "darker than normal."

while another representative stated that it contained "seven presentations that were all outside of ACell's scope of, you know, promotions, and there were unapproved patient's pictures in there and application types that weren't approved as well," (Matthew Vara Dep. ["Vara Dep."] at 64:4–10, ECF No. 56-8). Bonacorso made clear that he would only grant access to the Dropbox to those he trusted. (<u>See, e.g.</u>, Bonacorso-Vara Texts at 2, ECF No. 56-54 ("I don't want to allow her in our dropbox yet. She hasn't proved herself that well.")). White was not provided access to the Dropbox. (Dropbox Member List at 2, ECF No. 56-53).

B.   **<u>Procedural History</u>**

  White filed suit against ACell on January 21, 2020. (ECF No. 1). White's five-count Complaint alleges: retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h) (Count I); retaliation in violation of the Maryland False Claims Act, Md. Code Ann., Gen. Prov. § 8-107 (Count II); race discrimination in violation of the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("§ 1981") (Count III); retaliation in violation of § 1981 (Count IV); and breach of implied contract (Count V). (Compl. ¶¶ 69–127). He seeks incidental and consequential damages, lost wages and benefits, compensatory damages, punitive and exemplary damages, attorneys' fees and costs, and interest. (<u>Id.</u> at 21). ACell filed its Answer on February 27, 2020. (ECF No. 13).

  On February 8, 2021, following discovery, ACell filed a Motion for Summary Judgment. (ECF No. 51). On March 8, 2021, White filed an Opposition, (ECF No. 56), which the Court later sealed, (ECF No. 58). White filed an unsealed version of his

Opposition on March 31, 2021. (ECF No. 59). ACell filed a Reply in support of its Motion on April 26, 2021. (ECF No. 62).

## II.   DISCUSSION

### A.   <u>Standard of Review</u>

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation

or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Id. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (quoting Anderson, 477 U.S. at 247).

**B.**     **Analysis**

ACell has moved for summary judgment as to all five counts of White's Complaint. The Court will analyze each claim in turn.

**1.     Race Discrimination**

White brings his retaliation and discrimination claims pursuant to 42 U.S.C. § 1981. "Claims of racial discrimination in employment under § 1981 . . . are evaluated under the Title VII framework." Swaso v. Onslow Cnty. Bd. of Educ., 698 F.App'x 745, 747 (4th

Cir. 2017) (citing <u>Love-Lane v. Martin</u>, 355 F.3d 766, 786 (4th Cir. 2004)), <u>as</u>
<u>amended</u> (Aug. 11, 2017). Under this framework, a plaintiff may rely on two methods of
proof to establish his case: "(1) 'demonstrating through direct or circumstantial evidence
that his race was a motivating factor[10] in the employer's adverse employment action'; or
(2) relying on the burden shifting scheme set forth in <u>McDonnell Douglas Corp. v. Green</u>,
411 U.S. 792 (1973)." <u>Swaso</u>, 698 F.App'x at 747 (quoting <u>Holland v. Wash. Homes, Inc.</u>,
487 F.3d 208, 213–14 (4th Cir. 2007)).

### a. Direct Evidence

White asks the Court to analyze his race discrimination claim under a "mixed
motive" or "motivating factor" standard, i.e., under the first prong set forth in <u>Swaso</u>.
(Mem. Opp'n Def.'s Mot. Summ. J. ["Opp'n"] at 51–52, ECF No. 56-1). ACell counters
that the "motivating factor" standard is no longer applicable following the Supreme Court's
decision in <u>Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media</u>, 140 S. Ct. 1009
(2020). (Reply Supp. Mot. Summ. J. ["Reply"] at 7, ECF No. 62). ACell is correct. That
does not mean, however, that White is left with no ability to establish his discrimination
claim using direct and circumstantial evidence. As another district court has explained:

> Now, however, § 1981's causation standard is more
> rigorous. <u>See</u> <u>Comcast Corp.</u>, 140 S. Ct. at 1019. . . . To state
> a claim that is plausible under the but-for causation standard, a
> complaint must contain sufficient factual matter to show that

---

[10] The Supreme Court later made clear that the applicable causation standard in
discrimination claims brought under § 1981 is not a "motivating factor" causation standard,
but rather the "but for" standard. <u>Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media</u>,
140 S. Ct. 1009, 1019 (2020). Under that standard, "a plaintiff must initially plead and
ultimately prove that, but for race, it would not have suffered the loss of a legally protected
right." <u>Id.</u>

> racial prejudice was a necessary condition of a contractual impairment. See e.g., Bachman v. St. Monica's Congregation, 902 F.2d 1259, 1262–63 (7th Cir. 1990). But that does not mean that racial animus must be the sole reason for an alleged act. Thus, the Court finds that the fact a defendant has mixed motives—i.e., legitimate and illegitimate reasons for an alleged act—does not, in and of itself, render a § 1981 claim implausible.

Sharifi Takieh v. Banner Health, 515 F.Supp.3d 1026, 1045 (D.Ariz. 2021); see also McDonald v. City of Wichita, 735 F.App'x 529, 531–32 (10th Cir. 2018) ("[J]ury instructions equating but-for causation and 'sole cause' are legally erroneous." (citing Gentry v. E. W. Partners Club Mgmt. Co., Inc., 816 F.3d 228, 236 n.5 (4th Cir. 2016); Leal v. McHugh, 731 F.3d 405, 415 (5th Cir. 2013); Ponce v. Billington, 679 F.3d 840, 846 (D.C. Cir. 2012); Miller v. CIGNA Corp., 47 F.3d 586, 598–99 (3d Cir. 1995))). In other words, the fact that the Supreme Court has held that a heightened causation standard applies to claims under § 1981 does not mean that all such claims are necessarily analyzed through the McDonnell Douglas framework or that plaintiffs must prove that discrimination was the sole basis for the adverse action. Accordingly, the Court will review the evidence White offers in support of his direct evidence theory of discrimination.

As evidence of Snyder's discriminatory animus, White directs the Court to Snyder's racially offensive remarks directed toward White and his history of making other offensive and inappropriate remarks in the workplace. (Opp'n at 51–52). According to White, these facts "could certainly lead a juror to reasonably conclude that Snyder was predisposed to discriminate based upon race." (Id. at 52). In this Circuit, however, "[d]irect evidence encompasses conduct or statements that both (1) reflect directly the alleged [retaliatory]

attitude, and (2) bear directly on the contested employment decision." Laing v. Fed. Exp. Corp., 703 F.3d 713, 717 (4th Cir. 2013) (internal quotation marks and citation omitted). Thus, "[e]ven if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006) (citing Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999)). "To survive summary judgment on the basis of direct and indirect evidence, [plaintiff] must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action." Brinkley, 180 F.3d at 608 (citations omitted). "[I]n the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 300 (4th Cir. 2010) (citation omitted).

In his Opposition, White identifies just one adverse action that he argues was racially discriminatory: ACell placing him on a PIP. (See Opp'n at 50–62).[11] However,

_____

[11] White leaves no ambiguity regarding this argument, as the section headers covering his discrimination claim reference only his placement on the PIP and no other purported adverse actions. (See Opp'n at 50 ("C. White has presented sufficient evidence from which a jury could reasonably conclude that placement on a PIP constitutes racial discrimination in violation of 42 U.S.C. § 1981."); id. at 52 ("2. White has presented sufficient evidence from which a jury could conclude that his race was a motivating factor for placement on a PIP on November 1, 2017."); id. at 54 ("i. White has presented sufficient evidence that he was meeting ACell's legitimate expectations as of November 1, 2017 (the date of the PIP) and his manager, Bonacorso's, text messages, emails, cards and letters of commendation that continued up until eight (8) days before White reported Bonacorso for off-label marketing."); id. at 59 ("4. White has presented sufficient evidence from which a jury could reasonably conclude that ACell's proffered reasons for the PIP, his alleged poor performance and 'misconduct' was pretextual.")). Regardless, the Court's conclusion that White has not demonstrated a nexus between his direct evidence of discrimination and the

none of Snyder's alleged remarks share a nexus with ACell's decision to place White on a PIP. In most instances, Snyder's remarks are remote in time from the PIP and did not relate to the PIP. For example, Snyder's alleged "black mammy" and "urban jungle" remarks occurred in 2015, two or more years prior to the PIP. (White Dep. at 303:4–309:21). Similarly, Snyder's remark that White was "darker than normal" occurred in 2016. (Id. at 312:11–313:18). The only evidence remotely close in time to the PIP was Snyder's remark that he would "fire [White's] black ass," which he said after White arrived late to an event in August or September 2017. (Id. at 315:5–325:6).[12] But White's PIP does not mention tardiness or in any way reference or relate to the August/September 2017 event. Accordingly, the Court finds that White has failed to introduce evidence demonstrating a nexus between the direct evidence on which he purports to rely and the adverse action he identifies. Thus, White's discrimination claim must proceed under the McDonnell Douglas framework.

### b.    Prima Facie Case

To establish a prima facie case for race discrimination under the McDonnell Douglas framework, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) more favorable treatment of someone outside the protected class with comparable qualifications. Coleman

---

adverse actions he experienced would apply equally to his termination and his removal from certain sales accounts.

[12] In his deposition, White references the incident as occurring in August 2017. However, the parties appear to agree in their briefs that it occurred in September 2017. (See Mot. at 23; Opp'n at 12).

v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). More generally, the plaintiff is required to show that the employer took an adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Once the plaintiff meets his initial burden of establishing a prima facie case for discrimination, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc), abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013). Once the employer meets this burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)). "The final pretext inquiry merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination, which at all times remains with the plaintiff." Merritt, 601 F.3d at 294 (internal quotation marks and citation omitted).

Here, ACell does not dispute that White, who is African American, is a member of a protected class, nor does it dispute that White's PIP constituted an adverse employment action. Rather, ACell advances three arguments: (1) White's job performance was not satisfactory at the time of his PIP; (2) White has failed to introduce evidence of comparators outside of his protected class who were treated more favorably than him; and (3) ACell provided a legitimate, nondiscriminatory reason for placing White on the PIP. At bottom,

the Court agrees with all three of ACell's arguments and will enter judgment in ACell's favor on White's claim of discrimination.

Courts weighing whether a plaintiff's job performance was satisfactory must "evaluate the performance at the time of the alleged adverse action." Cooper v. Micros Sys., Inc., No. CCB-14-1373, 2015 WL 6549093, at *3 (D.Md. Oct. 27, 2015) (citing King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003)). Moreover, "the perception of the decisionmaker, and not the plaintiff's self-assessment, is the relevant inquiry." Cooper, 2015 WL 6549093, at *3 (citing King, 328 F.3d at 149). Thus, ACell argues that "[i]t is axiomatic that sales employees who are not meeting their sales goals and who are upsetting their customers to the point where they are banned, are not meeting their employer's legitimate expectations for a sales position." (Mot. at 29). In response, White explains that he was on track to exceed his annual budget at the time he was placed on his PIP. Further, White posits that, although he was banned from Beaumont and Henry Ford hospitals, his actions leading to those bans were reasonable and justified. Indeed, White notes that Bonacorso and Snyder supported him in the wake of his ban from Henry Ford and points to Fertel's testimony that White's conduct at Beaumont Farmington was professional and appropriate.

The Court is sympathetic to White's arguments and does not conclude that White's performance was necessarily deficient at the time ACell placed him on the PIP. However, the undisputed facts are that White missed his sales budgets for four out of the previous five months preceding his PIP, and White's ban from two different health systems in one

year was unprecedented at the company.[13] Even if White is correct that the bans were unjustified, it was nonetheless reasonable for ACell to take disciplinary action after the second incident in a short period of time. See Cooper, 2015 WL 6549093, at *3 (noting that "the perception of the decisionmaker . . . is the relevant inquiry" (citing King, 328 F.3d at 149)). It is not the Court's role "to sit 'as a kind of super-personnel department weighing the prudence of employment decisions.'" Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 901 (4th Cir. 2017) (quoting DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)); see also Lewis v. Gibson, 621 F.App'x 163, 165 (4th Cir. 2015) ("[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for [the adverse action against the plaintiff]." (quoting King, 328 F.3d at 150–51)). ACell has introduced undisputed facts supporting its perception that White was not performing at a satisfactory level at the time it placed him on a PIP. Accordingly, there is no genuine dispute of material fact as to this element of White's discrimination claim.

Even assuming arguendo that White could establish satisfactory performance, the Court would nonetheless grant ACell's Motion as to White's discrimination claim because White has failed to introduce evidence of more favorably treated comparators. To establish a claim of discrimination, a plaintiff must make more than a general statement that he was treated differently as a result of race. Robinson v. Loudon Cnty. Pub. Schs., No. 1:16-CV-

---

[13] White's reference to a lone encouraging note from Bonacorso to White on October 3, 2017, is unavailing. (See Bonacorso Notes at 4, ECF No. 33). Encouragement of workers is a common management tactic. It is not proof of overall satisfaction with an employee's job performance. Moreover, between sending this note and receiving the PIP, White missed another monthly sales budget and was banned from Beaumont Farmington (and, as far as he, Bonacorso, and Snyder knew, all of Beaumont Health System).

1604, 2017 WL 3599639, at *4 (E.D.Va. Aug. 18, 2017) (citing Coleman, 626 F.3d at 191).

Rather, plaintiffs must identify the proposed comparator and "establish a plausible basis

for believing [the employee was] actually similarly situated." Robinson, 2017 WL

3599639, at *4 (quoting Coleman, 626 F.3d at 191); see also Lawrence v. Glob. Linguist

Sols. LLC, No. 1:13CV1207, 2013 WL 6729266, at *4 (E.D.Va. Dec. 19, 2013)

(dismissing plaintiff's complaint because she failed to "point to any similarly situated

male comparators who were treated differently than Plaintiff"). Employees are similarly

situated when they "dealt with the same supervisor, [were] subject to the same

standards, . . . and engaged in the same conduct without such differentiating or mitigating

circumstances that would distinguish their conduct or the employer's treatment of them for

it." Haywood v. Locke, 387 F.App'x 355, 359 (4th Cir. 2010) (quoting Mitchell v. Toledo

Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

White first points to a white sales representative named Nick Paoletti as a

comparator. White has introduced evidence that after Paoletti was banned from selling to

a health system, rather than terminating him or placing him on a PIP, Bonacorso

administered no discipline and, instead, transferred additional accounts to Paoletti to make

up for the shortfall caused by the ban. (Opp'n at 56–57; see also Bonacorso Dep. at 30:7–

33:8). ACell, however, notes a key and ultimately dispositive distinguishing factor between

Paoletti and White: just one health system had imposed a ban on Paoletti, whereas White

had been banned from hospitals in different health systems based on two different incidents

in the span of under a year. This is a meaningful difference. When White was banned from

the first health system, like Paoletti, he received no discipline. It was only after a second

ban that ACell subjected White to the PIP. This is precisely the sort of "differentiating or mitigating circumstance[]" that the Fourth Circuit instructed could "distinguish their conduct or the employer's treatment of them for it." Haywood, 387 F.App'x at 359 (quoting Mitchell, 964 F.2d at 583). Accordingly, Paoletti is not a useful comparator.[14]

White next points to the fact that he was "the only sales representative who has ever been disciplined for 'insufficient sales' when performing above their annual aggregate budget for the year." (Opp'n at 58; see Snyder Dep. at 190:14–25). However, ACell notes that Bonacorso and Snyder placed Diggins, a white sales representative, on a PIP for misconduct and concerns about his sales strategy, specifically "major concerns about [his] territory and the majority of the business coming from one account." (Comparator PIPs at 9–10, ECF No. 51-22). Diggins received this PIP on January 4, 2017, despite selling

---

[14] ACell also argues that Paoletti is distinguishable from White because while Paoletti and White were both directly supervised by Bonacorso, White's second-level supervisor was Snyder, while Paoletti's was not. According to ACell, this is important because of statements White purportedly made reflecting his belief that Bonacorso was not a "racist" or a "bigot," thereby leaving Snyder as the sole possible source of the racist attitude toward him. (See White Dep. at 95:9–16, 235:9–16). In the Court's view, however, ACell offers a strained reading of White's statements. In the first statement, White rhetorically asked, "am I calling [Bonacorso] a racist because of that instance? No, I'm not." (Id. at 95:11–12). In the second statement, after counsel asks White about a conversation he had with another sales representative "confirming that [Bonacorso is] bigoted," White responded, "That was [the other sales representative's] opinion, okay, not my opinion." A plain reading of these statements causes the Court to conclude that in both cases, White was clarifying that he was not making a particular statement, as opposed to making the inverse statement. In other words, White's statement that Bonacorso was not a racist because of a particular instance is not the same as White saying that Bonacorso was not a racist. Similarly, White clarifying that a perception of Bonacorso as bigoted was someone else's perception is not the same as White disclaiming that perception. Thus, the Court disagrees with ACell's position that White has expressly exonerated Bonacorso from culpability for race discrimination.

$1,131,318 in product in 2016, exceeding his annual sales goal of $827,000 by over thirty-five percent. (Diggins Sales Spreadsheet at 5, ECF No. 62-1). Thus, in the same year White was placed on a PIP, his supervisors also placed a white sales representative with high sales on a PIP for concerns about his sales strategy and other misconduct. And, in any event, while White's sales were marginally above his prorated annual budget at the time he received his PIP, he had been below budget for four out of his previous five months and had just been banned by his second health system in under a year. Accordingly, even if ACell were unable to identify a white sales representative who had been placed on a PIP despite performing at or above budget on the year, the differentiating circumstances that preceded White's PIP are sufficiently unusual that it would "distinguish [White's] conduct or [ACell's] treatment of [him] for it." Haywood, 387 F.App'x at 359 (quoting Mitchell, 964 F.2d at 583).[15]

The Court turns briefly to White's argument that Bonacorso discriminated against White by not granting him access to the Dropbox, while only granting such access to

---

[15] White also directs the Court's attention to a sales representative named Paul Ackerman, whom he asserts had "missed his budget six (6) out of ten (10) months at the time of White's PIP," but who was not placed on a PIP or otherwise disciplined. (Opp'n at 59). In support of this statement, White cites page 170 of Snyder's deposition transcript, which has nothing to do with Ackerman or sales totals. Even assuming there is evidentiary support for White's assertion, White's PIP was only based in part on concerns about his sales. White had also recently been banned by two health systems. White does not argue that Ackerman was similarly the subject of a ban from multiple hospitals. Thus, ACell's failure to discipline Ackerman for his purportedly poor sales does not give rise to an inference of discrimination. For the same reasons, White's reference to other sales representatives who were not disciplined for insufficient speaker activities, (see Opp'n at 59), is unavailing because he has not provided evidence that those sales representatives were otherwise similarly situated with respect to the performance deficiencies that prompted White's PIP.

White's white colleagues. As an initial matter, the Court is skeptical of the premise that a manager may discriminate against an employee by failing to invite that employee to join him in engaging in allegedly unlawful activity. In any event, ACell has identified at least two white sales representatives, Underwood and Chris Tucker, who did not have access to the Dropbox. White has not advanced an argument for why he was more entitled to access to the Dropbox than his white colleagues who were similarly excluded. More importantly, this example of alleged disparate treatment does not relate to the adverse employment action White alleges. See Coleman v. McCarthy, No. SAG-17-1164, 2021 WL 165130, at *5 (D.Md. Jan. 15, 2021) (noting that a plaintiff must show "that similarly situated employees, outside of her protected classes, were treated differently with respect to the adverse employment action she alleges"). For these reasons, the Court cannot conclude that this comparator evidence supports an inference of discrimination.

### c.  Legitimate Nondiscriminatory Reason

Finally, for the same reasons the Court found that ACell perceived White as not performing his job satisfactorily at the time of his PIP, the Court finds that ACell has introduced—and White has failed to effectively counter—evidence of a legitimate, nondiscriminatory reason for placing White on a PIP: namely, White's unsatisfactory performance. For all these reasons, the Court will grant ACell's Motion and enter judgment in ACell's favor on White's claim of race discrimination in violation of 42 U.S.C. § 1981.

### 2.  Retaliation

White alleges that his January 18, 2018 letter to ACell (the "Gonek Letter") constituted protected activity under the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"),

the Maryland False Claims Act, Md. Code Ann., Gen. Prov. § 8-107 ("MFCA"), and 42

U.S.C. § 1981, and that ACell terminated him because of his protected activity. The Court

will analyze each statute in turn.

### a.    Section 1981 Retaliation

"A prima facie retaliation claim under 42 U.S.C. § 1981 has the same elements" as

a Title VII retaliation claim. Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th

Cir. 2015). Thus, the elements of a retaliation claim under Title VII and § 1981 are: (1)

engagement in a protected activity; (2) adverse employment action; and (3) a causal link

between the protected activity and the employment action. Coleman, 626 F.3d at 190;

Boyer-Liberto, 786 F.3d at 281. ACell does not contest that the Gonek Letter constituted

protected activity under § 1981, nor does it contest that White's termination constituted an

adverse action.[16] Rather, ACell asserts that White has failed to prove the requisite causal

---

[16] ACell does argue that two other actions identified by White—ACell's slow
turnaround on returning White's iPad and its refusal to allow White to attend the national
sales meeting—did not constitute adverse actions. In response, White concedes that these
actions do not constitute adverse actions under the relevant statutes. (Opp'n at 42–43).
White asserts, however, that the actions are nevertheless relevant evidence in support of
causation and retaliatory intent. White is correct that such evidence may be relevant to a
court's causation analysis; indeed, the Fourth Circuit has supported the position that actions
short of adverse employment actions may be probative of retaliatory intent. See U.S. ex
rel. Cody v. ManTech Int'l, Corp., 746 F.App'x 166, 180 (4th Cir. 2018) ("[T]he issue is
not whether that administrative leave constitutes an adverse employment practice, but
whether it can be probative of [Defendant's] retaliatory intent in this context.").

Moreover, although White does not appear to argue that his PIP was retaliatory,
such an argument would be unavailing. White asserts in his Opposition that following
Snyder's September 2017 threat to "fire [his] black ass," White "advised Bonacorso of
Snyder's racist comments and remarks." (Opp'n at 12). Thus, White could arguably point
to this report as protected activity and his PIP as retaliatory. However, in the testimony
White cites to support this assertion, White states only that he "told Tony, you know, that

relationship between the two. At bottom, the Court agrees and will enter judgment in ACell's favor on this claim.

White's causation argument in support of his § 1981 retaliation claim is premised almost entirely on temporal proximity. This is not necessarily inappropriate, as "temporal proximity is sufficient to establish a causal connection at the prima facie stage." Strothers v. City of Laurel, 895 F.3d 317, 336–37 (4th Cir. 2018) (citing Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994)). Indeed, the Fourth Circuit has found temporal gaps as long as four months sufficient to establish temporal proximity for the purposes of a Title VII retaliation claim. See Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). Thus, as White explains, "the five (5) week period between the protected activity and the termination of White's employment is sufficiently close to create an inference in White's favor." (Opp'n at 37 (citation omitted)).

White is correct that such a close temporal gap between protected activity and adverse action may ordinarily create an inference of discrimination. However, the Fourth Circuit has found that such an inference does not arise where the actions leading to an employee's termination occurred before the employee's protected activity:

this is what happened, and, you know, here I am." (White Dep. at 324:9–11). In the context of the testimony provided, however, it appears that White was referring to "what happened" with respect to his arrival time, not with respect to his interaction with Snyder. (See id. at 324:4–15). Similarly, White asserts in his Opposition that "Bonacorso confirmed the conversation and that White complained about Snyder, but as to whether the complaints related to inappropriate racial comments, Bonacorso testified: 'No, not that I remember.'" (Opp'n at 12–13). In support of this assertion, White cites to a page of Snyder's deposition testimony that has nothing to do with the September 2017 incident. (Snyder Dep. at 110). Thus, White has not directed the Court's attention to facts into the record supporting the assertion in his Opposition that he engaged in protected activity prior to the Gonek Letter.

> The actions that led to Francis' probation and termination began <u>before</u> her protected activity, belying the conclusion that a reasonable factfinder might find that BAH's activity was motivated by Francis' USERRA complaints. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 95 (2d Cir. 2001); <u>see also</u> <u>Frazier v. Fairhaven Sch. Comm.</u>, 276 F.3d 52, 67 (1st Cir. 2002) (noting that conduct that occurs both before and after the event leading to the alleged retaliation cannot form the basis of a Title IX retaliation claim).

<u>Francis v. Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 309 (4th Cir. 2006). While White does offer additional evidence of retaliatory intent, (<u>see</u> Opp'n at 38–44), it all relates to his FCA and MFCA claims. The sole evidence he relies on to demonstrate retaliatory intent with respect to his § 1981 claim is temporal proximity. That evidence, however, is not persuasive because the actions precipitating his termination—namely, the November 2, 2017 PIP and his subpar sales performance following the PIP—occurred prior to his January 18, 2018 protected activity. Accordingly, the Court finds that White has not created a genuine issue of material fact as to the causation element of his prima facie claim. For that reason, the Court will enter judgment in ACell's favor as to White's claim of § 1981 retaliation.

### b.    FCA Retaliation

As with Title VII and § 1981 retaliation claims, FCA "[r]etaliation claims can be proven by either the submission of direct evidence of retaliatory animus or by use of the <u>McDonnell Douglas</u> burden-shifting framework." <u>U.S. ex rel. Cody v. ManTech Int'l, Corp.</u>, 746 F.App'x 166, 176 (4th Cir. 2018) (citing <u>Foster v. Univ. of Md.-E. Shore</u>, 787

F.3d 243, 249 (4th Cir. 2015)). An employee seeking to establish a prima facie case of

FCA retaliation under the <u>McDonnell Douglas</u> framework must show: "(1) he engaged in

protected activity; (2) his employer knew about the protected activity; and (3) his employer

took adverse action against him as a result." <u>U.S. ex rel. Grant v. United Airlines Inc.</u>, 912

F.3d 190, 200 (4th Cir. 2018).

      White argues that he engaged in FCA-protected activity by raising concerns about

off-label marketing and violations of the Health Insurance Portability and Accountability

Act of 1996, 42 U.S.C. § 1320d <u>et seq.</u> ("HIPAA"), through the Gonek Letter and

subsequent communications with ACell representatives. ACell does not dispute that

White's reports regarding off-label marketing may be protected under the FCA. ACell

contends, however, that White did not raise concerns relating to HIPAA and, even if he

did, those concerns would not constitute protected activity under the FCA.

      The Court notes that the Gonek Letter does not explicitly or implicitly raise concerns

about HIPAA violations. Rather, White alleges that he reported HIPAA violations during

his call with Hrubes on January 30, 2018. Specifically, White asserts in his Opposition that

during his conversation with Hrubes, "White also reported that Bonacorso encouraged

sales representatives to take photographs of patients for marketing purposes without

authorization from the patient or hospital." (Opp'n at 26). The only evidence White cites

to support this assertion is a reference to two emails from Hrubes on January 30, 2018, and

February 1, 2018, neither of which mention HIPAA. (Hrubes-White Emails at 2–3). While

one of the emails broadly references "photos," (<u>id.</u> at 2), a plain reading of the email

suggests it refers to the photographs referenced in the letter from White's counsel, i.e., the

photographs of Bonacorso allegedly engaged in off-label marketing. White cites no affidavit or deposition testimony to support his assertion that he raised concerns about HIPAA violations during his conversation with Hrubes, nor does a search of the exhibits to White's Opposition reveal any such evidentiary support.[17] Accordingly, the Court finds that White has not raised a genuine dispute of material fact with respect to whether he engaged in protected activity relating to HIPAA violations.[18]

ACell does not dispute that: (1) White's concerns regarding off-label marketing may be protected under the FCA; (2) ACell knew of White's protected activity; and (3) that White's termination constituted an adverse action. Instead, as with White's § 1981 claim, ACell asserts that White has failed to create a genuine issue of material fact as to whether there was a causal relationship between White's protected activity and his termination. At bottom, the Court disagrees and will deny summary judgment as to this claim.

White once again points to the temporal proximity between the Gonek Letter and his termination as evidence of causation. As set forth above, however, "no retaliatory inference could be drawn solely from the temporal proximity of the protected activity and

---

[17] At another point in his Opposition, White states that he "also complained of the on-going HIPAA violations as to the unauthorized photographs of the patients." (Opp'n at 35). In support of this assertion, White broadly cites to his deposition testimony—without a pin cite—and to an exhibit containing a screenshot of a text message to Hrubes confirming that he sent the company his iPad. These documents fail to substantiate White's bald assertion.

[18] The Court notes that White has also failed to articulate a legal argument supporting his view that raising concerns about HIPAA violations constitutes protected activity under the FCA or the MFCA. Because the Court finds that White has failed to introduce evidence that he raised such concerns in the first place, however, the Court will not reach the question of whether doing so would constitute protected activity under those statutes.

discharge . . . where [t]he actions that led to [plaintiff's] . . . termination began <u>before</u> her
protected activity." <u>Cody</u>, 746 F.App'x at 181 (alterations in original) (internal quotation
marks and citation omitted). In the context of White's FCA retaliation claim, however,
White does not rely solely on temporal proximity to establish causation. Instead, White
points to other actions by Bonacorso that suggest he was concerned about White reporting
him to compliance. For example, Diggins testified that after ACell prevented White from
attending the NSM, Bonacorso told Diggins and other representatives present at the NSM
that White "might be coming for him, and if compliance calls, don't answer, let us know
compliance called and [Bonacorso] would tell us what to say or just don't say anything to
compliance." (Diggins Dep. at 38:4–19). Diggins added that Bonacorso "pulled us aside
and said, some stuff is going down with [White]. If compliance calls, I need you guys to
have my back." (<u>Id.</u> at 61:10–19). This evidence, taken together with evidence suggesting
that Bonacorso was maintaining a Dropbox folder containing unlawful off-label marketing
material, creates a genuine issue of material fact as to whether White's termination was
causally linked to Bonacorso's retaliatory animus towards him.[19]

     Under the <u>McDonnell Douglas</u> framework, the burden thus shifts to ACell to
articulate a "legitimate, nondiscriminatory reason for the adverse employment action."

---

[19] White argues that Bonacorso's comments at the NSM constitute direct evidence
of retaliatory animus. As with Snyder's allegedly racist comments, however, Bonacorso's
statements cannot constitute direct evidence of retaliatory animus under the law of this
Circuit because they do not "bear directly on the contested employment decision." <u>Laing</u>,
703 F.3d at 717 (quoting <u>Warch</u>, 435 F.3d at 520). That does not mean the comments are
irrelevant, only that they do not allow White to bypass the <u>McDonnell Douglas</u> framework
in establishing his retaliation claim.

<u>Hill</u>, 354 F.3d at 285. ACell asserts that even if White can establish his prima facie case, it had a legitimate, nondiscriminatory reason to terminate him because he failed to meet the requirements set forth in the PIP. In support of this, ACell points to testimony from Bonacorso and Snyder in which they assert that they made the decision to terminate White in early January 2018, prior to his protected activity. Thus, the burden shifts back to White to establish that ACell's proffered reason was pretextual. <u>Reeves</u>, 530 U.S. 143.

White offers several arguments in support of his position that ACell's proffered reason for terminating his employment was pretextual. As an initial matter, White notes that ACell has provided no evidence other than the testimony of Bonacorso and Snyder—both of whom are alleged to have taken part in the retaliation—for the assertion that the company had decided to terminate White prior to his protected activity for failing to meet the goals of the PIP. Moreover, White has offered testimony contradicting these statements—specifically, an affidavit in which White swears that Snyder told him on February 1, 2018—i.e., at the conclusion of the initial PIP period—that White had met the requirements of his PIP. (White Decl. ¶ 9).[20] ACell did not counter or contradict this testimony in its Motion or Reply. Thus, the Court is faced with contradictory testimony

---

[20] The Court notes that while ACell did not argue that such a "self-serving affidavit" was insufficient to survive summary judgment, such an argument would have proven unavailing in any event. <u>See</u> <u>Harris v. Mayor & City Council of Balt.</u>, 429 F.App'x 195, 198 n.5 (4th Cir. 2011) (rejecting the argument that self-serving affidavits are insufficient to defeat a motion for summary judgment so long as the affidavit complies with the requirements of Fed.R.Civ.P. 56 and does not contradict the affiant's prior testimony); <u>see also</u> <u>Lee-Thomas v. Prince George's Cnty. Pub. Sch.</u>, No. DKC-15-2010, 2017 WL 2733802, at *6 (D. Md. June 26, 2017) ("The general rule . . . remains that a court should not weigh the credibility of testimony of one party against the testimony of another at the summary judgment stage, even if it is self-serving.").

concerning a material fact from a terminated employee and those responsible for terminating him. Such a credibility determination must be left for the jury. Accordingly, White's FCA retaliation claim must survive summary judgment because "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. ACell's Motion will therefore be denied as to White's claim of FCA retaliation.

### c.    MFCA Retaliation

The Court is unaware of any decisions by Maryland courts setting forth the elements of a retaliation claim under the MFCA. However, in light of the similarities between the relevant statutory language, the Court finds that its analysis regarding White's FCA retaliation claim applies equally to White's claim under the MFCA. Compare 31 U.S.C. § 3730(h) with Md. Code Ann., Gen. Prov. § 8-107; see also Gharib v. J. of Comm. on Political Econ. of Good Soc'y, No. GJH-17-3476, 2018 WL 4679954, at *8 (D.Md. Sept. 27, 2018) ("The Court has not identified any federal or state courts addressing the MFCA in detail and will look to cases interpreting the analogous [FCA] for guidance.").

ACell has, however, introduced one argument unique to White's MFCA claim. The evidence before the Court suggests that the photographs purportedly showing Bonacorso engaging in off-label marketing were taken in 2013. (See Bonacorso Photographs at 5). White does not dispute this fact. Indeed, in the Gonek Letter, White states that the photographs were "taken several years ago." (Gonek Letter at 1). The MFCA, however, became effective on June 1, 2015, and did not apply retroactively. See Md. False Claims

Act, 2015 Md. Laws, Chap. 165 (codified at Md. Code, §§ 8-101–111 of the General

Provisions Article) ("This Act shall be construed to apply only prospectively and may not

be applied or interpreted to have any effect on or application to any claim made before

[June 1, 2015]."). Accordingly, the photographs do not appear to reflect activity prohibited

by the MFCA at the time it occurred. ACell thus argues that the MFCA claim should be

dismissed. White's response to this argument is brief. According to White:

> [I]n the present case, White was asked in September, 2017, if
> he had any knowledge of Bonacorso's off-label marketing.
> Therefore, when White reported Bonacorso on January 18,
> 2018, although the photographs were from 2013, he had an
> objectively reasonable belief that Bonacorso and ACell were
> violating the MFCA at that time. In addition, White also
> complained of the on-going HIPAA violations as to the
> unauthorized photographs of the patients. Exh. 12 and Exh. 44.

(Opp'n at 35). White thus asks that the Court reject ACell's argument and allow his MFCA

claim to proceed.

The Court is unpersuaded. At bottom, the scant facts supporting White's brief

counterargument as to his MFCA claim are insufficient to create a genuine issue of material

fact as to whether he raised concerns about off-label marketing that occurred after 2015.

Essentially, White asserts that because Hrubes had previously asked White about

Bonacorso engaging in off-label marketing, the Court should therefore infer that when

White, months later, notified ACell that he possessed evidence of Bonacorso engaging in

off-label marketing "several years ago," White must have held "an objectively reasonable

belief that Bonacorso and ACell were violating the MFCA [in September 2017]." (Gonek

Letter at 1; Opp'n at 35). But there are no grounds to make that inference; to do so would

be to conjure material facts out of whole cloth. The Court declines to do so. Moreover, as set forth above, the Court has found that White failed to introduce a genuine dispute of material fact with respect to whether he engaged in protected activity relating to HIPAA violations. Accordingly, White has failed to establish that he engaged in protected activity under the MFCA. The Court will therefore enter judgment in ACell's favor as to this claim.

### 3.   Breach of Contract

At the outset of his employment with ACell, White signed a Code of Business Conduct and Ethics ("2014 Policy"), which contained an anti-retaliation agreement stating as follows:

> **<u>No Retaliation</u>**
>
> The Company expressly forbids any retaliation against any officer or employee who, acting in good faith on the basis of a reasonable belief, reports suspected misconduct. Specifically, The Company will not discharge, demote, suspend, threaten, harass or in any other manner discriminate against, such an officer or employee in the terms and conditions of his or her employment. Any person who participates in any such retaliation is subject to disciplinary action, including termination.

(ACell Code of Business Conduct & Ethics ["2014 Policy"] at 11, ECF No. 56-11). White argues that this provision created an implied contract between he and ACell, which ACell breached when it terminated him following his report of unlawful activity.

ACell asserts that the 2014 Policy was superseded in 2016 by the Standards of Business Ethics & Conduct Policy ("2016 Policy"), which states:

> **Non-Retaliation**

> ACell is committed to ensuring that employees and agents are comfortable reporting issues or concerns. ACell will not tolerate any form of harassment or retaliation against any employee or other person who in good faith reports a known or suspected violation of the law, these Standards, or Company Policies and Procedures.
>
> Managers must ensure that any employee under their supervision is not subject to retaliation for making a good faith report[.]

(ACell Standards of Business Ethics & Conduct Policy ["2016 Policy"] at 21, ECF No. 56-12). ACell argues that this provision constituted a "general statement of policy" rather than an express promise and, as such, did not create an implied contract between the parties. (Mem. Law Supp. Mot. Summ. J. ["Mot."] at 46–48, ECF No. 51-1).

This Court has required a plaintiff seeking to establish a breach of an implied employment contract to show that:

> (1) the employer adopted an employment policy or procedure which clearly mandates the satisfaction of certain conditions precedent to discharge, which condition can be objectively applied; (2) the mandatory policy was either part of the employees personal employment contract or was communicated to and known by the employee; (3) the employee either began working or continued working with knowledge of this policy or procedure; (4) the employer discharged the employee without complying with the policy or procedure; and (5) the employee suffers damages as a result thereof.

King v. Marriot Int'l, Inc., 195 F.Supp.2d 720, 727 (D.Md. 2002) (citations omitted). Expanding on the first King factor, this Court has also held that "general statements of policy are no more than that and do not meet the contractual requirements for an offer." Scott v. Merck & Co., No. L-09-3271, 2010 WL 4941994, at *4 (D.Md. Nov. 30,

2010) (alteration omitted) (quoting <u>MacGill v. Blue Cross of Md., Inc.</u>, 551 A.2d 501, 503 (Md.Ct.Spec.App. 1989)). Thus, this Court has held that a statement of company policy to "behave in an ethical manner" was too general to form the basis for a breach of implied contract claim. <u>See</u> <u>Ayers v. ARA Health Servs.</u>, 918 F.Supp. 143, 148 (D.Md. 1995). Similarly, a Maryland appellate court has held that a company's commitment to fill vacancies "with the most qualified applicant, consistent with the law, fairness, and its expressed intention to take affirmative action" did not create an implied contract in a failure to promote case because there was not "an express commitment . . . to promote appellant if he is qualified for a position." <u>MacGill</u>, 551 A.2d 501, 504.

The Court will assume <u>arguendo</u> that White has met elements two through five of the <u>King</u> test regardless of whether the 2014 Policy or the 2016 Policy applies. The Court is thus left to determine whether the policies meet the first element of <u>King</u> and are more than "general statements of policy." On this point, this Court has previously held that language similar to that contained in the 2014 Policy forms an implied contract with an employee. In <u>Scott v. Merck & Co.</u>, this Court considered the impact of language in a Code of Conduct that stated: "The fact that an employee has raised concerns in good faith, or has provided information in an investigation, cannot be a basis for denial of benefits, termination, [or] demotion." 2010 WL 4941994, at *2 (alteration in original). This Court held that such language was "sufficiently specific and definite to constitute an enforceable promise" where it provided that "reporting business practice issues . . . may not be the basis for demotion, denial of benefits, or termination." <u>Id.</u> at *5. The Court expressly distinguished that concrete promise from language contained in other company documents

stating that "retaliation is 'unacceptable' and 'will not be tolerated,'" which the Court described as "aspirational." Id.

Thus, in the Court's view, while the differences between the 2014 Policy and the 2016 Policy are superficially modest, they are consequential when considered in this light. In the 2014 Policy, ACell promises that "[t]he Company **will not** discharge, demote, suspend, threaten, harass or in any other manner discriminate against . . . an officer or employee" "who, acting in good faith on the basis of a reasonable belief, reports suspected misconduct." (2014 Policy at 11 (emphasis added)). In the 2016 Policy, ACell tempers its statement, offering only that "ACell **will not tolerate** any form of harassment or retaliation against any employee or other person who in good faith reports a known or suspected violation of the law[.]" (2016 Policy at 21 (emphasis added)). Thus, in the 2014 Policy, ACell makes a promise regarding actions it will not take, whereas in the 2016 Policy, it makes a statement regarding actions it will not tolerate. In the Court's view, ACell's unwillingness to "tolerate" certain actions suggests an intent to discipline employees who engage in those actions, which is meaningfully distinct from a promise that the company will not take those actions. See Scott, 2010 WL 4941994, at *5. Thus, the Court concludes that the 2014 Policy was "sufficiently specific and definite to constitute an enforceable promise," whereas the 2016 Policy is not.

The Court must therefore determine which policy applied at the time of White's termination. In the context of a change to an employee handbook, Maryland courts have held that "[b]y continuing to work for appellee after the new manual's issuance, appellant, by her conduct, impliedly would have assented to a modification of her employment

agreement." Castiglione v. Johns Hopkins Hosp., 517 A.2d 786, 790 n.4 (Md.Ct.Spec.App. 1986). The Fourth Circuit favorably cited this language from Castiglione in the context of determining whether certain personnel policies implemented after the beginning of employment affected that employee. See Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 240 (4th Cir. 1991). The Conkwright Court held:

> This view comports with the expectations of employees and employers. All employees expect to be covered by the personnel policies of the company in existence at the time of their current work, not when they were hired twenty years ago, unless special benefits are expressly provided for. Moreover, an employer expects to treat all its employees according to the same basic benefit rules, and not apply a hodgepodge of rules based on the starting date of the employee.

Id.; see also Scott, 2010 WL 4941994, at *3 ("[P]olicy directives regarding aspects of the employment relation become contractual obligations when, with knowledge of their existence, employees start   or continue to work for   the   employer."   (quoting Dahl   v. Brunswick Corp., 356 A.2d 221, 224 (1976))). Moreover, Maryland courts have found in the analogous context of contractual disclaimers that while "reasonable notice" must be given to employees of a new policy, "[r]easonable notification is not necessarily actual notification." Elliott v. Bd. of Trs. of Montgomery Cnty. Cmty. Coll., 655 A.2d 46, 51 (Md.Ct.Spec.App. 1995). Thus, "a uniform, system wide distribution of [the updated policy] will generally constitute reasonable notice thereof." Id. at 52.

Here, White does not argue that he lacked notice of the 2016 Policy; rather, he asserts that "ACell updated the policy and incorporated the same language as the policy it had White sign." (Opp'n at 49). In support of this assertion, White cites to Hrubes'

deposition testimony, which states that ACell's policies "didn't [change]" "with regard to reporting issues or concerns and non-retaliation" when it rolled out the 2016 Policy. (Hrubes Dep. at 49:11–16, ECF No. 51-23, 56-2). However, this statement, made long after White's termination, does not nullify the clear and meaningful differences in the two policies, as outlined above. The Court thus finds that White has introduced no genuine issue of material fact regarding his notice of and acquiescence to the 2016 Policy.

Because White had notice of the 2016 Policy and continued to work for ACell, he impliedly assented to the policy; therefore, the 2016 Policy was applicable on the date of his report and subsequent termination. As explained above, the 2016 Policy, which set forth certain actions that ACell would "not tolerate," was not "sufficiently specific and definite to constitute an enforceable promise." See Scott, 2010 WL 4941994, at *5. Accordingly, White's breach of implied contract claim must fail as a matter of law.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part ACell's Motion for Summary Judgment (ECF No. 51). A separate Order follows.

Entered this 1st day of September, 2021.


                              _____/s/_____
                              George L. Russell, III
                              United States District Judge